563 So.2d 1171 (1990)
STATE of Louisiana
v.
Benjamin DAUGHTERY.
No. KA 89 0509.
Court of Appeal of Louisiana, First Circuit.
May 30, 1990.
*1172 Louis G. Garrot and Marc Amy by Marc Amy, Asst. Dist. Atty., Abbeville, for plaintiff/appellee.
Patricia A. Thomas, Office of the Public Defender of Vermillion Parish, Abbeville, for defendant/appellant.
Before EDWARDS, LANIER and FOIL, JJ.
LANIER, Judge.
The defendant, Benjamin Daughtery, was indicted by a Vermillion Parish grand jury for first degree murder, a violation of La.R.S. 14:30. The indictment was subsequently amended to charge second degree murder, a violation of La.R.S. 14:30.1. The defendant pled not guilty and elected trial by jury. Subsequently, a motion for change of venue was granted, and the case was transferred to East Baton Rouge Parish. After trial by jury, the defendant was found guilty as charged. He received a sentence of life imprisonment at hard labor, *1173 without benefit of parole, probation, or suspension of sentence. This appeal followed.

FACTS
This case is about the contract killing of an Abbeville businessman, George Warren, Sr. The defendant was originally contacted about the "hit" by Charles Canter.[1] Later, Canter and the defendant met at the defendant's place of employment and discussed arrangements for the murder. It was agreed that defendant would be paid $5,000 in advance and another $20,000 after the murder. The defendant recruited his brother-in-law, Anthony Fondaw, to assist him as a backup gunman.
On the evening of February 8, 1987, the defendant and Fondaw drove to the victim's home in Abbeville. Armed with a 9 mm. semi-automatic pistol, the defendant entered the victim's living room, fired several shots and wounded the victim in the shoulder. Fondaw, armed with a shotgun, apparently fled from the doorway when the defendant began firing. When the defendant's pistol jammed, the victim and his son-in-law, Chad Darby, managed to disarm the defendant and forced him outside. The victim's wife, Eleanor Faye Warren, and the victim's daughter, Wendy Darby, were also present in the living room at this time and witnessed these events. Immediately thereafter, the victim and Mr. Darby armed themselves, while Mrs. Darby telephoned the police. The defendant armed himself with a shotgun, reentered the living room and exchanged gunfire with the victim. In this exchange of gunfire, the defendant was wounded in the arm; but he inflicted a fatal shotgun wound on the victim before fleeing from the house.
Fondaw was arrested in Houma on February 9, 1987. The defendant sought treatment for his gunshot wound at a Houma hospital on February 9, 1987, and was arrested the following day. The defendant subsequently gave a confession about his involvement in the murder.[2]

SUPPRESSION OF IDENTIFICATIONS

(Assignment of error 1)
The defendant contends that the trial court erred in denying his motion to suppress pretrial identifications and in-court identifications by Mrs. Warren and Mr. and Mrs. Darby. Specifically, the defendant contends that the three witnesses to the murder, Mrs. Warren and Mr. and Mrs. Darby, viewed television news coverage of his arrest and/or pictures of him in the newspaper accounts of the crime and, therefore, any in-court identification of him by these three witnesses was tainted.
At the hearing on this motion to suppress, Mrs. Warren testified that she had not seen any television news coverage of the crime, nor had she read any newspaper articles about it. At the trial, Mrs. Warren identified the defendant in court and testified she had not seen him since the night of the murder.
Mrs. Darby testified that, when she saw the television news coverage of the defendant's arrest, she went into shock and was hospitalized. She also testified that she saw the defendant's picture in newspaper articles about the crime after her release from the hospital. However, she testified that she would have been able to identify the defendant without seeing the television and newspaper pictures of him.
Mr. Darby testified that he saw television news coverage of the defendant's arrest but did not see the defendant's picture in the newspaper. He also testified that he would have been able to identify the defendant even if he had not seen the defendant on television.
A defendant attempting to suppress an identification must prove the identification *1174 was suggestive and there was a likelihood of misidentification as a result of the identification procedure. State v. Lewis, 489 So.2d 1055 (La.App. 1st Cir.), writ denied, 493 So.2d 1218 (La.1986). The viewing of television news coverage of a defendant's arrest or seeing his picture in a newspaper is not an "identification procedure". Based on the testimony of these three witnesses, the trial court correctly denied the motion.
Further, because Ms. Warren never saw or read any media coverage of the crime, her in-court identification of the defendant was not tainted. Mr. Darby did not testify at the trial. Mrs. Darby was called as a defense witness and was not asked to make an in-court identification of the defendant.
This assignment of error is without merit.

ADEQUACY OF DEFENSE FUNDING

(Assignment of error 2)
The defendant contends that the trial court erred in denying his motion to provide funds for experts and investigative assistance.
The Louisiana Supreme Court has recognized that the State should supply funds for experts and investigators upon a showing by an indigent accused that he is unable otherwise to obtain existing evidence crucial to his defense. State v. Madison, 345 So.2d 485 (La.1977); State v. Trahan, 481 So.2d 729 (La.App. 1st Cir.1985). When the issue is considered on review, the question becomes whether or not the denial of funds has substantially prejudiced the defendant at the trial. State v. Prestridge, 399 So.2d 564 (La.1981).
In his motion, the defendant requested funds for a ballistics expert, a forensic pathologist, an investigator and a public opinion expert. However, he concedes that funds for an investigator and a forensic firearms expert were granted through writ applications to the Louisiana Supreme Court and the Third Circuit Court of Appeal. Because the motion for a change of venue was granted, there was no error in denying funds for a public opinion expert. The only issue remaining is whether or not the trial court erred in denying funds for a forensic pathologist.
In his brief, the defendant now contends that he needed the expert assistance of both a forensic pathologist and a forensic serologist. Specifically, he argues that a forensic pathologist could have "testified more strongly concerning the angle of the fatal shot and from where it must have originated." He also argues that a forensic serologist could have examined the shotgun from which the fatal shot was fired "to determine if any bloodstains could be detected upon it, which would have strengthened the defense that Daughtery took no part in the actual killing." The basis of this argument is that it was Fondaw, and not the defendant, who inflicted the fatal shotgun wound upon the victim. The overwhelming evidence of record shows the defendant planned and participated in the murder. Thus, even if the victim's fatal shotgun wound was inflicted by Fondaw, the defendant still would be guilty of second degree murder under the law of principals. See La.R.S. 14:24. The fact sought to be proven does not exculpate the defendant.
This assignment of error is without merit.

VOIR DIRE

(Assignment of error 3)
The defendant contends that the trial court erred in denying his motion for an individual, sequestered voir dire.
In his brief to this court, the defendant contends that prospective jurors develop a "group attitude" and become easily affected by statements from other prospective jurors. He contends that the way to avoid such a problem is to conduct individual voir dire of prospective jurors and to sequester jurors immediately upon selection. However, the Louisiana Supreme Court has specifically held that, in the absence of special circumstances, a trial court's denial of a motion for individual, sequestered voir dire is not an abuse of discretion. State v. Robinson, 302 So.2d 270 (La.1974); State *1175 v. Gray, 526 So.2d 1268 (La.App. 3rd Cir.), writ denied, 531 So.2d 468 (La.1988).
The defendant's motion for individual, sequestered voir dire was based on two grounds: (1) he was charged with first degree murder and, therefore, exposed to the death penalty; and (2) the case had received extensive pretrial publicity. However, the charge against the defendant was subsequently reduced to second degree murder and a change of venue was granted. Given these facts, we find no showing by the defendant of special circumstances to justify individual, sequestered voir dire. Accordingly, the trial court did not abuse its discretion in denying this motion.
This assignment of error is without merit.

MOTION TO RECUSE TRIAL JUDGE

(Assignment of error 8)
The defendant contends that the trial judge, Byron J. Hebert, should have been recused because of his family relationship to one of the prosecutors in the instant case, Assistant District Attorney Marc T. Amy.
La.C.Cr.P. art. 671 A (2) provides:
A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
. . . . .
(2) Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree; ... (Emphasis added)
At the hearing on the defendant's motion to recuse Judge Hebert, Mr. Amy testified that he and Judge Hebert were first cousins and shared the same common ancestor, their grandfather. The defendant contends that Judge Hebert and Mr. Amy are related in the second degree within the meaning of La.C.Cr.P. art. 671 A (2). The word "degree" is defined in La.C.C. art. 900, which provides:
The propinquity of consanguinity is established by the number of generations, and each generation is called a degree.
Furthermore, La.C.C. art. 901 provides:
The series of degrees forms the line. The direct line is the series of degrees between persons who descend one from another. The collateral line is the series of degrees between persons who do not descend one from another, but who descend from a common ancestor.
In the direct line, the number of degrees is equal to the number of generations between the heir and the deceased. In the collateral line, the number of degrees is equal to the number of generations between the heir and the common ancestor, plus the number of generations between the common ancestor and the deceased.
Because Judge Hebert and Mr. Amy did not descend one from another, they are collateral relations. First cousins, such as Judge Hebert and Mr. Amy, are related in the fourth degree.[3] Therefore, La.C.Cr.P. art. 671 A (2) did not require that Judge Hebert be recused in this case.
This assignment of error is without merit.

APPOINTMENT OF A SPECIAL PROSECUTOR

(Assignment of error 9)
The defendant contends the trial court erred in denying his motion for the appointment of a special prosecutor. Specifically, he contends the district attorney and his assistants should have been recused because William Babin, one of the *1176 two attorneys appointed to represent him, became an assistant district attorney in Lafayette Parish.
La.C.Cr.P. art. 680 provides, in pertinent part:
A district attorney shall be recused when he:
(1) Has a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice;
. . . . .
(3) Has been employed or consulted in the case as attorney for the defendant before his election or appointment as district attorney.
In an action to recuse the district attorney, the defendant has the burden of showing, by a preponderance of the evidence, that the district attorney has a personal interest in conflict with the fair and impartial administration of justice. State v. Edwards, 420 So.2d 663 (La.1982). The fact that an assistant district attorney previously represented a defendant in the same criminal matter does not ipso facto require the district attorney and other members of his staff to be recused. State v. Bell, 346 So.2d 1090 (La.1977). The law presumes that the attorney will respect a client's confidences. Where the attorney is not called upon to use any confidential knowledge gained through their former association against his former client, the accused suffers no prejudice. State v. Johnston, 546 So.2d 1231 (La.App. 1st Cir.1989).
Babin was employed by the Lafayette Parish Public Defender's Office and was originally appointed as co-counsel to represent the defendant. Before trial, Babin resigned from the Lafayette Parish Public Defender's Office and became an assistant district attorney in Lafayette Parish. At the hearing on the motion for the appointment of a special prosecutor, defense counsel noted that Babin was still enrolled as co-counsel for the defendant. Defense counsel also noted that the 15th Judicial District is comprised of the parishes of Acadia, Lafayette, and Vermillion. However, Babin testified that he was appointed to handle the death penalty phase of the prosecution should the defendant be convicted of first degree murder. Furthermore, Babin testified that he had not divulged any information about the defendant or his defense strategy to the district attorney or to any of his assistants. The record reflects Babin played no part in the prosecution of Daughtery. Therefore, the defendant was not prejudiced since Mr. Babin's testimony indicated that no confidential communications had been revealed.
This assignment of error is without merit.

SUPPRESSION OF INCULPATORY STATEMENT

(Assignment of error 13)
The defendant contends that the trial court erred in denying his motion to suppress his initial inculpatory statement. This statement was made to Chief Deputy Hubert Trahan at the Vermillion Parish Correctional Center on July 3, 1987, and led to a subsequent videotaped confession later that afternoon. The defendant also claims that the videotaped confession should be suppressed because it was tainted by the initial inculpatory statement to Chief Deputy Trahan.[4]
In his brief to this court, the defendant contends that the inculpatory statement should have been suppressed on two grounds. First, he argues that the initial statement was involuntary because his "will was overborne by being placed in solitary confinement without medical treatment for wounds inflicted upon him." Specifically, he argues that the statement was *1177 not voluntary because he just had been released from solitary confinement the previous day and was experiencing pain from his gunshot wound to the arm and injuries received in his escape attempt on June 22, 1987. Second, he argues that "he was not properly advised of his right to remain silent and to have counsel present before the initial statement was made to Chief Deputy Trahan." He contends that Chief Deputy Trahan should have contacted defense counsel before speaking with him.
For a confession or inculpatory statement to be admissible into evidence, the State must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menace, or promises. La.R.S. 15:451; State v. Knight, 536 So.2d 589 (La.App. 1st Cir. 1988). The admissibility of a confession is in the first instance a question for the trial court. Its conclusions on the credibility and weight of testimony relating to the voluntariness of the confession for the purpose of admissibility will not be overturned on appeal unless they are not supported by the evidence. State v. Peters, 542 So.2d 592 (La.App. 1st Cir.1989).
At the September 4, 1987 suppression hearing, Chief Deputy Trahan testified that the defendant was limited to one cell while in the Vermillion Parish Correctional Center, but this practice was a standard procedure. He also explained that the defendant was not placed in solitary confinement to induce a confession. Instead, the defendant received ten days in solitary confinement because of his escape attempt on June 22, 1987. Chief Deputy Trahan testified that the defendant never complained to him about his injuries, never stated that he was in pain, and never requested pain medication. Chief Deputy Trahan stated that a nurse visited the Correctional Center daily. He explained that any inmate needing medical attention could inform one of the jailers that he wished to see a nurse, and the inmate would be placed on the nurse's visiting list. Chief Deputy Trahan also stated that the defendant had reasonable access to his attorney, who visited the Correctional Center twice a week.
At the September 4, 1987, and January 19, 1989 suppression hearings, Chief Deputy Trahan explained that the defendant approached him on July 3, 1987, and indicated that he wished to talk. Chief Deputy Trahan testified that, when he first removed the defendant from his cell, he did not know that the defendant wished to talk about the murder. When the defendant began to state incriminating facts about the offense, Chief Deputy Trahan advised the defendant to remain silent and confer with his attorney before going any further. However, the defendant continued to talk, admitting his part in the murder and implicating the other co-defendants. At this point, Chief Deputy Trahan called defense counsel and the district attorney's office. He then took the defendant to defense counsel's office, where the defendant and defense counsel spoke in private. Afterwards, the defendant gave a lengthy, videotaped confession in the presence of his attorney and the assistant district attorney. Chief Deputy Trahan specifically testified that he made no threats, inducements, or promises to the defendant before the inculpatory statement or the videotaped confession.
The defendant testified that Chief Deputy Trahan did not force him to talk. Instead, he explained that he was experiencing pain from his gunshot injury and from recent injuries received in his escape attempt. He stated that he had refused treatment and was not taking any pain medication at that time. The defendant also testified that he was confused when he made the initial inculpatory statement to Chief Deputy Trahan. When explaining why he gave the initial inculpatory statement and subsequent videotaped confession, he stated: "In the first confession, why I said it and why I finally did it, I really don't really know at this point in time. When I give [sic] the second one, it was already too late, so why not just go ahead and go all the way through it." However, on rebuttal, Chief Deputy Trahan testified that at no time on July 3 did the defendant appear to be confused or depressed.
*1178 At the September 4, 1987 suppression hearing, defense counsel testified that she visited the Vermillion Parish Correctional Center twice a week. She testified that during March and April of 1987, she saw the defendant at least once a week. In June and July of 1987, she saw the defendant on a regular basis. She testified that she saw the defendant after his June 22, 1987 escape attempt and observed that he had a minor head wound and two swollen fingers. Finally, she testified that on July 3, 1987, she informed Chief Deputy Trahan that she was surprised the defendant had stated that he wished to confess and she expressed her displeasure at this turn of events.
Considering the above testimony from these two suppression hearings, we conclude that the trial court correctly denied the defendant's motion to suppress. The defendant's own testimony negated any form of police misconduct. The evidence shows the defendant voluntarily initiated the conversation with Chief Deputy Trahan on July 3, 1987, wherein the defendant made his initial inculpatory statement. The subsequent videotaped confession was made freely and voluntarily after the defendant met with, but refused the advice of, his defense counsel. The ruling of the trial court is correct.
Finally, the defendant contends that, even if the initial inculpatory statement and videotaped confession should not have been suppressed, the trial court erred in failing to excise certain portions of the videotaped confession, which was played to the jury at the trial. Specifically, he argues that certain portions of the videotaped confession containing references to other crimes evidence should have been deleted.
Near the end of the January 19, 1989 suppression hearing, the trial court indicated that certain portions of the videotaped confession referring to other crimes evidence would be deleted. Immediately before the videotape was played to the jury, however, defense counsel objected, stating that although the defense had requested that all references to other crimes evidence be deleted from the videotape, certain portions containing this evidence had not been deleted. The trial court overruled the objection and allowed the videotaped confession to be played to the jury as edited.
It is well-settled that defense counsel must state the basis for an objection when it is made, pointing out the specific error to the trial court. La.C.Cr.P. art. 841; State v. Sosa, 328 So.2d 889 (La.1976); State v. Freeman, 500 So.2d 807 (La.App. 1st Cir. 1986). The grounds for objection must be sufficiently brought to the attention of the trial court to allow him the opportunity to make the proper ruling and prevent or cure any error. State v. Provo, 396 So.2d 1298 (La.1981); State v. Brown, 481 So.2d 679 (La.App. 1st Cir.1985), writ denied, 486 So.2d 747 (La.1986).
Neither at the trial nor in his brief to this court, does the defendant specifically refer to the particular portions of the videotaped confession which allegedly should have been deleted because of references to other crimes evidence. Because the defendant failed to make a specific objection at the trial concerning the portions of the videotaped confession allegedly containing other crimes evidence, any error in failing to excise such portions of the videotaped confession is waived and this argument will not be considered on appeal.
This assignment of error is without merit.[5]

DECREE
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] At various places in the record, Canter is also spelled Cantor.
[2] In his confession, Daughtery implicated Canter, Fondaw and a third person who were prosecuted separately. Canter was convicted of second degree murder. The record before us does not reflect a disposition of Fondaw's case. The third person was found not guilty and, therefore, he will not be mentioned by name in this case. Canter and Fondaw are not parties to this appeal.
[3] See also former La.C.C. art. 892, which provided:

In the collateral line the degrees are counted by the generations from one of the relations up to the common ancestor exclusively, and from the common ancestor to the other relations.
Thus brothers are related in the second degree; uncle and nephew in the third degree; cousins german in the fourth, and so on.
[4] Co-defendants Canter and the third person also attempted to have the defendant's confession suppressed. The hearing on this motion to suppress was held on September 4, 1987. After the hearing, the trial court denied the motion. Because the defendant makes reference to, and comparisons between, the September 4, 1987 motion to suppress hearing and the instant motion to suppress hearing, which was held on January 19, 1989, a copy of the September 4, 1987, suppression hearing transcript was ordered by this court and included in the instant appeal record.
[5] Assignments of error numbers 4, 5, 6, 7, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 were not briefed on appeal and, therefore, are considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.